**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

WILLIAM A. LINTON; STACY A.
LINTON,

      *Plaintiffs-Appellants,*

v.

UNITED STATES OF AMERICA,

      *Defendant-Appellee.*

No. 09-35681

D.C. No.
2:08-cv-00227-TSZ

OPINION

Appeal from the United States District Court
for the Western District of Washington
Thomas S. Zilly, Senior District Judge, Presiding

Argued and Submitted
August 4, 2010—Seattle, Washington

Filed January 21, 2011

Before: John T. Noonan, David R. Thompson and
Marsha S. Berzon, Circuit Judges.

Per Curiam Opinion

## COUNSEL

Cory L. Johnson, Seattle, Washington, for the appellants.

Jonathan S. Cohen, Department of Justice, Washington, D.C., for the appellee.

**OPINION**

PER CURIAM:

Taxpayers William A. Linton and Stacy A. Linton appeal the district court's grant of summary judgment in favor of the United States on their claim for a refund of 2003 federal gift taxes. The Lintons contend that they gifted interests in a limited liability company ("LLC"); the government contends that they gifted cash, securities, and real property. We have jurisdiction under 28 U.S.C. § 1291, and we reverse and remand for further proceedings.

The parties have assumed that in determining the character of the Lintons' gifts, the sequencing of two transactions is "critical," *Senda v. Comm'r*, 433 F.3d 1044, 1046 (8th Cir. 2006), and we do so too, without deciding whether that is always so in cases of this ilk. The transactions at issue are: (1) the contribution of cash, securities, and real property to the limited liability company, and (2) the transfer of LLC interests to the Lintons' children's trusts. If done in that order (and with some lapse of time between the transactions), as the Lintons contend occurred here, the gifts would ordinarily be characterized as gifts of LLC interests, and the value of those LLC interests might be discountable for tax purposes. If, however, the contributions to the LLC occurred *after* the transfer of LLC interests to the children's trusts, the gifts would ordinarily be characterized as indirect gifts of the particular contributed assets and would not be discountable. *See id.*

**BACKGROUND**

William A. Linton formed WLFB Investments, LLC ("WLFB"), a Washington limited liability company, in November 2002. On January 22, 2003, William and Stacy A. Linton met with attorney Richard Hack to sign a series of documents. At the meeting, William gifted half of the per-

centage interests in WLFB to Stacy. Also, William and/or Stacy signed *and dated* the following documents:

- **Quit Claim Deed**: signed by William and conveying a parcel of his separate property real estate to WLFB. The parties agree the quit claim deed was effective on January 22.

- **Assignment of Assets**: signed by William as assignor and by both William and Stacy as assignees on behalf of the LLC.

- **Letters**: signed by William and authorizing the transfer of securities and cash to WLFB. The parties disagree as to when the transfers of securities and cash were effected.[1]

At the same meeting with attorney Hack, William, Stacy, and William's brother James Linton, signed, *but left undated*, several other *documents:*

- **Trust Agreements** (four total—one for each child): signed by William and Stacy as grantors and by James as trustee; forming and apparently funding irrevocable trusts for the children.

- **Gift Documents** (eight total—one each from William or Stacy to each trust): signed by William or Stacy as assignor and by James as trustee,

---

[1] U.S. Bancorp Piper Jaffray, Inc., apparently received William's letter on January 24 and made the transfers between January 24 and 31. RBC Dain Rauscher, Inc., appears to have made the transfers between January 24 and 29. The parties dispute whether the transfers were legally completed on those dates or on January 22, when the general "Assignment of Assets" was signed. We need not resolve this dispute. As we conclude that neither party has established when the LLC interests were gifted, neither party is entitled to summary judgment on the present record. Whether the precise date of the funding matters will depend on the gifting date.

gifting 11.25 percentage interests in WLFB to each respective trust.

Two or three months later, attorney Hack assembled these key documents. For all undated documents, he filled in the missing date as January 22, 2003. In his deposition, Hack stated this insertion was erroneous, and that these documents should have been dated January 31, 2003. William agrees that January 31 was the correct date. This testimony is consistent with that of Caryl Thorp, an accountant with Moss Adams LLP, who advised the Lintons on the ordering of the transactions.

Some of the subsequent reporting and documentation of the transactions also supports the Lintons' alleged sequence of events. *First*, WLFB's federal partnership income tax return for 2003, prepared by Moss Adams, shows the contributions as initially being credited equally to William's and Stacy's *individual* capital accounts in the limited liability company. The return then shows capital transferred from their individual accounts along with a commensurate increase in the capital accounts for the children's trusts. *Second*, William's and Stacy's individual federal gift tax returns for 2003, prepared by attorney Hack, describe the gifts as gifts of percentage interests in "WLBF [sic]" and show the date of the gifts as January 31, 2003. *Third*, WLFB's "Membership Interest Ledger," prepared by attorney Hack's office, shows, in the first row, that William owned 100% of WLFB upon contribution of the real estate and portfolio assets. The first row also shows William's transfer of 50% of his interest in the LLC to Stacy. Subsequent rows show their transfers of percentage interests in the LLC to the children's trusts. However, all dates for all Ledger rows are blank. *Fourth*, a share valuation report, prepared by Moss Adams, states that percentage interests in the LLC were transferred from the Lintons to the children's trusts on January 31.

In their gift tax returns for 2003, the Lintons characterized their gifts to the children's trusts solely as gifts of WLFB percentage interests. The Lintons determined the gifts were worth only 47% of the value of the underlying capital, due to the LLC's restrictions on ownership and control of the LLC interests. The Internal Revenue Service ("IRS") rejected the application of the 47% discount, arguing that: (1) the Lintons made indirect gifts of cash, securities, and real property to the children's trusts, or (2) the Lintons' gifts should be treated as gifts of cash, securities, and real property under the step transaction doctrine.[2] Prior to formal assessment by the IRS, William and Stacy each made an advance payment of the claimed tax deficiency and filed suit in the district court seeking a refund of gift taxes paid.

Upon cross-motions, the district court granted the government's motion for summary judgment and denied the Lintons' motion for partial summary judgment on the indirect gift issue. *Linton v. United States*, 638 F. Supp. 2d 1277 (W.D. Wash. 2009). The district court relied on express language in the Trust Agreements and Gift Documents to determine the children's trusts were created and the gifts of the LLC interests were made to those trusts on January 22, 2003. *Id.* at 1286-87. The court also determined the contributions of cash, securities and real property were made to the LLC either simultaneously with or after the gifts of the LLC interests to the children's trusts. *Id.* at 1287. Thus, the district court concluded, "the Lintons' transfers of real estate, cash, and securities enhanced the LLC interests held by the children's Trusts,

---

[2]The government also challenged the Lintons' valuation of the gifts. In discounting the value of the gifts by 47%, the Lintons relied on a valuation report prepared by Moss Adams. In that report, Moss Adams determined the LLC interests were less valuable than the corresponding capital accounts because the LLC agreement restricted the transfer of the interests outside the family and reserved all "authority or power to act" to the "Managers"—William and Stacy Linton. The valuation challenge is not at issue on this appeal.

thereby constituting indirect gifts to the Trusts of pro rata shares of the assets conveyed to the LLC." *Id.*

The district court also determined, in the alternative, that even if the Lintons established that the cash, securities and real property were contributed to the LLC before the gifts of the LLC interests to the children's trusts, the Lintons "nevertheless made indirect gifts to their children's Trusts under the step transaction doctrine." *Id.* In arriving at this conclusion, the court considered "three alternative tests: (i) the binding commitment test; (ii) the end result test; and (iii) the interdependence test," and determined that regardless of which test was used, the step transaction doctrine applied. *Id.* at 1288 (quotation marks omitted). The district court noted that the Lintons made no affirmative decision to delay the gifts, and no evidence suggested the trust res was exposed to real economic risk during the alleged interim between the contributions to the LLC and the gifts of the LLC interests to the children's trusts. *Id.* at 1290.

## STANDARD OF REVIEW

We review a grant of summary judgment de novo. *Universal Health Servs., Inc. v. Thompson*, 363 F.3d 1013, 1019 (9th Cir. 2004). We view the evidence in the light most favorable to the nonmoving party, determining "whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Id.*

## DISCUSSION

### I

**[1]** A gift tax is imposed on a donor for a "transfer of property by gift." 26 U.S.C. § 2501(a)(1). The tax applies "whether the gift is direct or indirect." 26 U.S.C. § 2511(a).

The parties call on us to determine when the Lintons donated the LLC interests to their children's trusts: Did they

do so before they funded the LLC (so the Lintons would potentially be liable for the full value of the assets conferred, as an indirect gift, to their children), or was it after they funded the LLC (so the Lintons would be entitled to market-ability and minority discounts on the assets transferred)? The assets were transferred to the LLC at some date or dates between January 22 and January 31.

**[2]** A gift is complete for federal tax purposes when "the donor has so parted with dominion and control as to leave in him no power to change its disposition . . . ." 26 C.F.R. § 25.2511-2(b); *see also Smith v. Shaughnessy*, 318 U.S. 176, 181 (1943) ("The essence of a [taxable] gift by trust is the abandonment of control over the property put in trust."). The state law of gifts informs our analysis of whether and when the donor has parted with dominion and control in a manner adequate to give rise to federal tax liability. *See Jones v. Comm'r*, 129 T.C. 146, 150 (2007) ("In order to make a valid gift for Federal tax purposes, a transfer must at least effect a valid gift under the applicable State law."); *cf. United States v. Nat'l Bank of Commerce*, 472 U.S. 719, 722 (1985) ("[I]n the application of a federal revenue act, state law controls in determining the nature of the legal interest which the taxpayer had in the property." (quotation omitted)); *Aquilino v. United States*, 363 U.S. 509, 514 n.3 (1960); *Shepherd v. Comm'r*, 115 T.C. 376, 384 (2000), *aff'd* 283 F.3d 1258 (11th Cir. 2002) ("look[ing] to applicable State law . . . to determine what property rights are conveyed"). This conclusion follows from the general principle that federal tax law "creates no property rights but merely attaches consequences, federally defined, to rights created under state law." *Nat'l Bank of Commerce*, 472 U.S. at 722 (quotation omitted); *Morgan v. Comm'r*, 309 U.S. 78, 80 (1940) ("State law creates legal interests and rights. The federal revenue acts designate what interests or rights, so created, shall be taxed."); *cf. United States v. Mitchell*, 403 U.S. 190, 197 (1971) (explaining that

"federal income tax liability follows ownership. . . . In the determination of ownership, state law controls.").[3]

**[3]** Under Washington law, "the elements of a completed gift are (1) an intention of the donor to give; (2) a subject matter capable of delivery; (3) a delivery; and (4) acceptance by the donee." *In re Marriage of Zier*, 147 P.3d 624, 628 (Wash. Ct. App. 2006). The transfer of the LLC interests occurred when all four elements of a completed gift first existed simultaneously. We must determine when that was. We discuss each element individually, but we defer discussion of the first element, intention to give, until the end, as here it is both the decisive element and the most difficult to determine.

_____

[3]The state law of gifts is not determinative of whether a transaction is taxable as a gift for purposes of the federal gift tax or of when a transaction becomes sufficiently complete to be so taxable, though it necessarily informs federal tax law's determination of those questions: State law provides the shape to the transaction which, depending on the transaction's contours, federal law then may characterize as giving rise to gift tax liability. *See Pahl v. Comm'r*, 150 F.3d 1124, 1128 (9th Cir. 1998) (holding that "we look to federal law to determine what interest creates tax liability. We look, however, to state law to determine whether the taxpayer has the requisite interest."); *cf. Morgan*, 309 U.S. at 81 ("If it is found in a given case that an interest or right created by local law was the object intended to be taxed, the federal law must prevail no matter what name is given to the interest or right by state law."). Thus, for instance, while donative intent may be relevant to the state law question of whether a transfer occurred by gift, by contract, or not at all, *cf. Buckerfield's Ltd. v. B.C. Goose & Duck Farm Ltd.*, 511 P.2d 1360, 1363 (Wash. Ct. App. 1973), if a transfer did occur, donative intent is irrelevant to whether the federal gift tax applies. *See* 26 C.F.R. § 25.2511-1(g)(1) (whether the gift tax applies depends "on the objective facts of the transfer and the circumstances under which [the gift] is made, rather than on the subjective motives of the donor."); *Dickman v. Comm'r*, 465 U.S. 330, 333 (1984) ("The statutory language of the federal gift tax provisions purports to reach *any* gratuitous transfer of any interest in property." (emphasis added)); *cf. Nat'l Bank of Commerce*, 472 U.S. at 722 ("Once it has been determined that state law creates sufficient interests in the taxpayer to satisfy the requirements of the statute, state law is inoperative, and the tax consequences thenceforth are dictated by federal law." (quotation omitted)).

a)  *Subject matter capable of delivery*

**[4]** Subject matter capable of delivery (here, interests in the LLC) existed since the creation of the LLC in November 2002. This element, therefore, existed at all times relevant to the Lintons' January 2003 transactions.

b)  *Delivery*

"[O]nly such delivery is required as the nature of the thing given and the circumstances under which it is given will permit, and so it is generally held the delivery may be manual, constructive or symbolic. . . . Whether what was done was sufficient to constitute a delivery depends on the nature of the property and the attendant circumstances." *Marriage of Zier*, 147 P.3d at 628.

**[5]** Unlike a precious gem or the keys to a vault, LLC interests do not lend themselves to manual delivery. Instead, they are delivered through the execution of papers. As a result, while one might distinguish the manual delivery of a gem from a prior or subsequent transfer of title to the gem, it is somewhat artificial to separate the "delivery" of an LLC interest from the intention to donate it. *Cf. id.* at 629 (delivery of corporation's stock effected, even where stock certificates were not manually delivered to donee); *Henderson v. Tagg*, 412 P.2d 112, 116 (Wash. 1966) (same). We suspect, therefore, that the Washington law of gifts would collapse its analysis of the delivery element of an alleged gift of LLC interests into its analysis of the intent to donate.

**[6]** In the alternative, the element of delivery was at least present no later than the intent to donate. On January 22, 2003, the taxpayers signed two kinds of documents: one, the gift documents stating that each taxpayer "hereby gifts to the [relevant] Trust . . . a total of 11.25 percentage interests in WLFB Investments, LLC," and another, the trust agreements, stating "at the time of signing this Agreement, the Grantors

have transferred percentage interests in the WLFB Investments, LLC . . . to the Trustee for the Trust." These documents were signed in the presence of the trustee, James Linton, the legal representative of the trust, to whom delivery to the trust would need to be made. On this alternative account, the element of delivery was present on January 22, 2003.

It is true that the gift documents and trust agreements were left undated on January 22, 2003. Washington law might consider the blank space left for the date as creating ambiguity as to whether a delivery occurred on January 22, 2003, especially if it determined the delivery of an LLC interest by looking for an objective manifestation of an intent to deliver. If that were so, then, the inquiries into the delivery and the intent to donate elements of a gift would, as intimated at the outset, be one and the same here. Donation and delivery of an abstract equity interest are hard to distinguish, and, as we later explain, Washington law would also look to an objective manifestation of the intent to donate to determine that element of a gift. In any case, on either interpretation of what Washington law requires for delivery, that element of a gift was present no later than the element of intent to donate.

### c)  Acceptance

**[7]** There is little Washington case law on what constitutes "acceptance" of a gift. This dearth of cases is, perhaps, unsurprising, given that the plaintiffs in most disputes over gifts are the alleged donees, so acceptance is not contested. In any case, "acceptance is presumed, subject to the donee's right to refuse or disclaim," RESTATEMENT (THIRD) OF PROP. (WILLS & DON. TRANSFERS) § 6.1(b) (2003), and neither party has directed the court to any evidence that the trustee disclaimed the LLC interests on January 22, 2003, or at any later date. Thus, whether a gift of LLC interests occurred on January 22, 2003 depends entirely on the presence or absence of the remaining element of a gift: the intent to donate.

d) *Intent to Donate*

The Lintons aver that they did not intend to donate the interests on January 22, 2003. But Washington law does not apply a subjective-intent standard in the interpretation of legal instruments. *See Hearst Commc'ns, Inc. v. Seattle Times Co.*, 115 P.3d 262, 267 (Wash. 2005) ("[W]hen interpreting contracts, the subjective intent of the parties is generally irrelevant if the intent can be determined from the actual words used."). In other words, Washington courts "do not interpret what was intended to be written but what was written." *Id.* Washington probate law similarly follows an "objective manifestation" method of interpretation in the exegesis of wills, donative documents that are close cousins of gift documents. *See In re Estate of Curry*, 988 P.2d 505, 508 (Wash. Ct. App. 1999) (explaining that "[e]xtrinsic evidence of surrounding facts and circumstances may be admitted to explain the language of a will when uncertainty arises as to the testator's true intention. But extrinsic evidence may not be considered for the purpose of proving intention as an independent fact, or of importing into the will an intention not expressed therein." (quotations omitted)).

In the absence of contrary authority, therefore, we presume that the Washington law of gifts applies an objective standard to the determination of donative intent generally, especially where a writing exists.[4] *Cf. Proctor v. Forsythe*, 480 P.2d 511,

---

[4]We acknowledge that the Restatement does make subjective intent the relevant standard for the interpretation of gift documents. *See* RESTATEMENT OF PROP. (THIRD): WILLS AND OTHER DONATIVE TRANSFERS § 10.1 (2003) ("The controlling consideration in determining the meaning of a donative document is the donor's intention. The donor's intention is given effect to the maximum extent allowed by law."); *id.* at § 10.2 ("In seeking to determine the donor's intention, all relevant evidence, whether direct or circumstantial, may be considered, including the text of the donative document and relevant extrinsic evidence."). But Washington courts have not adopted this rule. They disregard it in interpreting wills, *see Curry*, 988 P.2d at 507-08, even though the Restatement applies the rule to all donative documents, including wills. We see no reason to think Washington courts would follow the Restatement on this point with respect to some donative documents, but not others.

513 (Wash. Ct. App. 1971) (finding an intent to give based on the "*expressed* intent" of the donor) (emphasis added).

The gift documents, signed on January 22, 2003, provide that the Lintons "hereby gift" the LLC interests. The objective manifestation of the Lintons' intent to donate the LLC interests on January 22, 2003 might therefore seem plain. If that were so, then, under Washington law, all four elements of a gift would be present on January 22, 2003, and the gift of LLC interests would be complete on that date.

**[8]** But the story is more complex. First, the gift documents were not dated on January 22, 2003, which creates considerable objective ambiguity as to the Lintons' intent to make the donation effective on that date. More importantly, execution of a gift document, alone, is not a sufficient objective manifestation of an intent to donate. As the Restatement indicates, "[t]he mere preparation of a donative document does not effect a present transfer necessary to perfect a gift. Such a writing becomes effective when the donor manifests the intention that the document is to be operative to make a present transfer." *Id.* at § 6.2 cmt. u. In other words, a writing, on its own, is not a sufficient objective manifestation of intent to donate at the time of the writing, or at all. Circumstances surrounding the writing must show that the writing was meant to be effective.

**[9]** Most often, the writing will be effective "when the donor puts the document beyond retrieval" by delivering the document to the donee. *Id.*[5] We assume this rule applies in

---

[5] The Restatement provides:

> The delivery of the document by the donor to the donee is an act manifesting that the donor intends the document to be presently operative, unless there is evidence that the delivery was made for some other purpose. If, for example, the purpose of the delivery was to allow the donee or the donee's representative to inspect the document to see if any portion of it should be rephrased, the delivery would lack its normal significance.

Washington. So the execution of the gift documents on January 22, 2003 was alone not enough to make the gifts effective on that date. To know when the Lintons objectively manifested the intent to donate the LLC interests, we must know when they put the gift documents "beyond retrieval" or otherwise objectively manifested an intent to make them effective. As we explain, we do not see evidence of when they did so in the record before us, so we reverse and remand for such proceedings as the district court finds necessary to make that determination.

After the signing on January 22, 2009, the gift documents remained with the Lintons' attorney, Richard Hack. That Hack retained the documents might indicate there was no intent to donate on January 22, because Hack, the donors' agent, was to await instructions from his clients as to when to make the donation effective. And, indeed, the gift documents provide that the Lintons "appoint Richard Hack, as attorney to transfer the percentage interests on the books of the Company."[6] Moreover, Hack testified that he later came to believe

---

> Delivery of an inter vivos donative document occurs when the donor puts the document beyond retrieval. . . .
>
> A delivery of the document by the donor to someone other than the donee is a manifestation that the document is presently operative, unless the circumstances indicate otherwise. . . .
>
> A manifestation that the document is to be presently operative may be made without delivery of the document to anyone, if the outward and visible acts of the donor evidence an intent to make a present transfer.

*Id.*

[6]We note, but do not resolve, a possible ambiguity in the gift documents' appointment of Hack as agent. The gift documents may appoint Hack as an agent to effect the gifts at some later date, or the gift documents may effect the gifts themselves (after all, they do "hereby gift" the LLC interests) and appoint Hack only to do whatever subsequent paperwork is needed to reflect that the gifts were made. While the latter appears the more natural reading to us, we leave this issue open for the district court to resolve if it finds the need to do so.

that his client would have wanted the documents to be dated January 31, suggesting that the Lintons did not intend for the transfer to be effective until January 31 and that Hack, acting as the Lintons' agent, made them effective on that date.

But that conclusion is at odds with the facts before us. At their January 22 meeting, the Lintons did not give Hack instructions as to when to make the gifts effective. Hack testified "When [William Linton] was at my office [on January 22], he didn't know [when he wanted to make the gifts effective], and he wanted to work that out with [his accountant]." William Linton appears, in fact, never to have given Hack any instructions as to when to make the gifts effective. Instead, Hack reconstructed Linton's intent later, apparently in late March or early April, based on documents provided him by the Lintons' accountant. Hack testified: "I didn't circle back with Bill and grab him by the shoulders and say, 'Hey, Bill, is this the date and is this really what you want to do?' We left that open. No, I didn't do that at all. I used the accountant's data to prepare the gift tax return."

Thus, because the Lintons never instructed Hack to make the gifts effective on January 31, they cannot plausibly claim that they left the documents with Hack with instructions to make the gifts effective on January 31. More importantly, even if the Lintons had given Hack such instructions, Hack appears to have taken no action on January 31 that might have made the gifts effective. January 31 cannot, therefore, be the date on which the gifts became effective, at least not for purposes of summary judgment on the record currently before the Court.

If the Restatement represents Washington law in this regard, and we presume it does, the current record suggests two possibilities as to the date the gifts became effective: *Either* James Linton, the trustee (and, therefore, for legal purposes, the donee), left the meeting on January 22, 2003, with copies of the (undated) gift documents, and his doing so was

a sufficient *objective* manifestation that the gift documents were intended to be effective immediately. *Or* Bill and Stacy Linton appointed Hack to be their agent with the power to make the gift documents effective at some later date, that later date occurring whenever Hack finalized the gift documents (by dating them, albeit incorrectly) and made some objective manifestation that the gift was effective (such as by sending a copy of the documents to James Linton). On this second account, the gifts were likely effective, as a matter of Washington law, in March or April, around the time Hack put together the minute book.

**[10]** In sum, the determinative question as to when the gift of the LLC interests occurred is the first date at which objective circumstances existed that would suggest the gift documents were meant to be operative (and all three other elements of a gift existed under Washington law). The relevant objective circumstance could be, but is not necessarily, when the trustee James Linton was given a copy of the signed gift document, because on that date "the donor put[ ] the document beyond retrieval," RESTATEMENT, § 6.2 cmt. u, thereby objectively manifesting an intent to make the gift documents operative. Because the record is subject to contrary inferences as to when that, or some other event objectively manifesting the Lintons' intent to make the gift documents operative, first occurred, the government is not entitled to summary judgment on this pivotal point. We therefore remand to the district court for such proceedings as it deems necessary to resolve this question.[7]

---

[7]Of course, though necessarily informed by state law, federal law is not beholden to the technicalities of state law in assessing federal tax liability. *See, e.g.*, *Frank Lyon Co. v. United States*, 435 U.S. 561, 572-73 (1978); *Morgan*, 309 U.S. at 80-81. But we have not discussed the substance-over-form doctrine in our analysis of when the LLC interests were transferred because form is significantly aligned with substance when it comes to the timing of the transactions. Courts have explained, and we elaborate below, that the relative timing of the two transactions required for a gift via a lim-

We recognize the possibility that the district court might determine that there was no one event which independently constituted an objective manifestation of the Lintons' intent to make the gift documents operative, and instead decide that that intent was objectively manifested by the gradual accretion of events, including the signing of the undated gift documents, and various actions the Lintons took on the assumption that the LLC interests already had been transferred. But such a lack of one independently sufficient event should not matter, for present purposes, so as long as the district court can determine that the accumulation of objective circumstances was or was not sufficiently complete before the LLC was funded.

## II

The Lintons contend that they are entitled to summary judgment because even if the government is right about timing, no gift would have occurred and so they would therefore have no gift tax liability. Their argument is that if the transactions occurred in the order the government contends (i.e., first, the LLC interests were transferred to the trusts, and then the assets were transferred to the LLC), then no gift to the trusts occurred at all. The Lintons rely on a provision of the

ited liability entity is of importance because of the risk of a change in valuation to which the funded entity interests are exposed before they are transferred to the children. *See Holman v. Comm'r*, 130 T.C. 170, 189 (2008), *aff'd* 601 F.3d 763 (8th Cir. 2010); *Gross v. Comm'r*, 96 T.C.M. (CCH) 187, 192 n.5 (2008). The degree of risk, if any, to which the funded entity interests is exposed is almost wholly dependent on the state law question of when the gifts occurred.

We also observe that the parties and the district court considered the possibility of reforming the gift documents. Reformation, even if possible, would be irrelevant. The question in a tax case such as this is when the LLC interests actually were donated, not when they should have been. When the LLC interests were transferred is an historical fact, which a court may ascertain but which it cannot travel through time to alter retroactively.

LLC agreement, providing that "A Member's Capital Account shall be increased by the Member's capital contributions to the Company . . . ." If the Lintons gifted assets to the company after they had gifted the percentage interests in the company to their children, the gifted assets would, by virtue of this provision, be credited to their own (i.e., the parents') capital accounts. If only the donors' capital accounts were enhanced by the transfer of assets to the LLC and there was no subsequent transfer from the donors' capital accounts to the children's capital accounts, then there was no gift for tax purposes. *See Shepherd v. Comm'r*, 115 T.C. at 389 ("Obviously, not every capital contribution to a partnership results in a gift to the other partners, particularly where the contributing partner's capital account is increased by the amount of his contribution, thus entitling him to recoup the same amount upon liquidation of the partnership."). By contrast, if the transactions had occurred in the order the Lintons intended, then by virtue of the IRC § 704 capital account rules incorporated in the LLC agreement, the transfer of the LLC interests would have effected a pro rata transfer of the donors' capital accounts to the donees' capital accounts. *See* 26 C.F.R. § 1.704-1(b)(2)(iv)(*l*).

The Lintons' "failed-gift" theory is clever; unfortunately for them, it is too clever. The membership ledger of the LLC shows that the capital accounts of the children's trusts were, in fact, increased, as does the LLC's informational return that its accountants prepared and filed with the IRS in March 2004. The Lintons contend that if we conclude the government is right about the timing of the transactions, these documents were prepared on a mistaken assumption (i.e., that the LLC interests were transferred after the assets, and, therefore, by virtue of the IRC § 704 capital account rules, included a pro rata transfer of the assets from the donors' capital accounts to the donees') and should be ignored. On their theory, the informational return and the ledger would only reflect what everyone believed to be the state of the capital accounts, not the actual state of the capital accounts.

**[11]** But tax law is concerned "with the realities of a situation and not with the formalities of title." *Estate of Fortunato*, 99 T.C.M. (CCH) 1427, 1433 (2010) (quotation omitted)*; cf. Frank Lyon Co.*, 435 U.S. at 572 ("[T]axation is not so much concerned with the refinements of title as it is with . . . the actual benefit for which the tax is paid."); *Pahl*, 150 F.3d at 1127-1129. The membership ledger and the LLC's informational return together reflect the substantive reality of the situation: All parties involved regarded the trusts' capital accounts as having been enhanced. In other words, all concerned parties acted as if William and Stacy Linton had "so parted with dominion and control [over the assets] as to leave in [them] no power to change [their] disposition." 26 C.F.R. § 25.2511-2(b).

**[12]** The Lintons' failed-gift argument, by contrast, relies on the formal technicalities of state law. (Even though it incorporates the IRC § 704 capital account rules, the LLC agreement is a contract, which, like the background interests in property that it regulates, is governed by state law.) The failed-gift argument is formal because it relies on the technicalities of title (i.e., whether a state court presented with the issue would hold that the capital accounts were legally enhanced by the gifting of the LLC interests), but ignores the substantive reality that all concerned treated the accounts as enhanced and so, for all effective purposes, they were so.

**[13]** In other words, the Lintons may be right that, if the government is correct about the timing of the transactions, the ledger and informational return may have technically been in error, because the transfer of the assets to the LLC would not have automatically enhanced the trusts' capital accounts, and there was no subsequent transfer from the parents' capital accounts to those of the trusts. But this nicety of state law is too fine to have federal tax consequences, especially given federal tax law's heightened suspicion of state law's formal technicalities when all the parties involved have a familial relationship. *See Brown v. United States*, 329 F.3d 664, 673

(9th Cir. 2003) (holding that where parties to a transaction have a familial relationship, "heightened scrutiny" of its substance is appropriate); *Kornfeld v. Comm'r*, 137 F.3d 1231, 1235 (10th Cir. 1998) (holding that where "parties to the transactions in question are related, the level of skepticism as to the form of the transaction is heightened"). Absent interest from the Internal Revenue Service, the only conceivable way that the substantive realities (i.e., that all concerned treated the capital accounts as enhanced) would be realigned with the short-term formal technicalities of state law (i.e., the absence of adequate paperwork making the transfer to the children's capital accounts) would be if one of the parties concerned became aware of the discrepancy and decided to pursue litigation. Given that all parties involved in the transactions were members of the same family and their interests in the transactions were aligned, *cf. Brown*, 329 F.3d at 673 (disregarding legal form in part because the donee was "unlikely to flout the taxpayer's intention"), that possibility is so remote as not to affect federal tax law's assessment of the transactions' substantive realities.[8] We therefore hold that the Lintons are not entitled to summary judgment on their failed gift theory.

## III

The district court determined that, even if the sequence of events was as the Lintons contend, the gifts would still be characterized as gifts of cash, securities, and real property to the children's trusts under the step transaction doctrine. The step transaction doctrine "collapses 'formally distinct steps in an integrated transaction' in order to assess federal tax liability on the basis of a 'realistic view of the entire transaction.' "

---

[8]Moreover, over time, the formal niceties of state law (i.e., whether a state court would determine that the capital accounts were enhanced) could come to match the substantive reality (i.e., that all concerned regarded the children's capital accounts as enhanced) through the running of state law statutes of limitations, estoppel and other state law doctrines of property.

*Brown*, 329 F.3d at 671 (quoting *Comm'r v. Clark*, 489 U.S. 726, 738 (1989)).[9]

---

[9]We note at the outset our hesitation about the need to apply any of the traditional three tests that make up the step transaction doctrine once the issue of the timing of the transactions is resolved. As the government acknowledged at oral argument, the step transaction doctrine "really [is] what drives this kind of case," including the primary question of the order in which the transactions occurred.

The step transaction doctrine is one of the many "substance-over-form" doctrines in tax law. *See Brown*, 329 F.3d at 671; *see generally* Joseph Bankman, *The Economic Substance Doctrine*, 74 S. Cal. L. Rev. 5 (2000) (discussing origins and difficulties of substance-over-form doctrines, including step transaction doctrine). It "combines a series of individually meaningless steps into a single transaction" for purposes of federal tax treatment. *Esmark, Inc. & Affiliated Cos. v. Comm'r*, 90 T.C. 171, 195 (1988).

Courts have insisted that family limited partnerships be funded before the partnership interests are distributed for the same reason that they apply the step transaction doctrine: to ensure that the two transactions are adequately distinct that the second transaction merits independent, and more favorable, tax treatment. *See, e.g.*, *Holman*, 130 T.C. at 189 ("[T]he passage of time may be indicative of a change in circumstances that gives independent significance to a partner's transfer of property to a partnership and the subsequent gift of an interest in that partnership to another."); *Gross*, 96 T.C.M. (CCH) at 192 n.5 (noting the importance of the "real economic risk" of a change in valuation of assets donated to a partnership during an eleven-day "hiatus" before which partnership interests were gifted).

To obtain favorable tax treatment, the Lintons needed to transfer assets to the LLC and then wait at least some amount of time before they gifted the LLC interests to their children. The waiting period would subject the gifted assets to some risk of changed valuation before they were transferred, through the LLC, to the children's trusts. That risk would make the two transactions distinct for tax purposes. (The government has not challenged that the nine days between January 22 and January 31 is a sufficiently long period to make the transactions distinct, notwithstanding that some of the value transferred to the LLC was cash. *Cf. Gross*, 96 T.C.M. at 192 n.5 (noting that the Tax Court "might view the impact of an 11-day hiatus differently in the case of another type of investment[,]" subject to less risk than "heavily traded, relatively volatile common stocks.")). Others have noted, in different contexts, the similarity between the step transaction doctrine and the requirement that two transactions be timed in a

Whether a court's application of the step transaction doctrine to undisputed facts "is an issue of fact or law is a question over which we have struggled." *Brown*, 329 F.3d at 670. As stated previously, we ordinarily review grants of summary judgment de novo. The government contends, however, that the application of the step transaction doctrine to undisputed facts is a question of fact to be reviewed under the clearly erroneous standard. We need not resolve this dispute, as we would reverse the district court under either standard of review.

**[14]** The step transaction doctrine treats multiple transactions as a single integrated transaction for tax purposes if all of the elements of at least one of three tests are satisfied: (1) the end result test, (2) the interdependence test, or (3) the binding commitment test. *True v. United States*, 190 F.3d 1165, 1174-75 (10th Cir. 1999). Although the doctrine considers the substance over the form of the transactions, " 'anyone may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose the pattern which will best pay the Treasury.' " *Brown*, 329 F.3d at 671 (quoting *Grove v. Comm'r*, 490 F.2d 241, 242 (2d Cir. 1973)).

certain manner. *See Weikel v. Comm'r*, 51 T.C.M. (CCH) 432, 438 (1986) ("Courts will often, in addition to the [familiar three step transaction doctrine] tests . . . examine the timing of the transaction at issue."); Yoram Keinan, *Rethinking the Role of the Judicial Step Transaction Principle and a Proposal for Codification*, 22 AKRON TAX J. 45, 74-77 (2007) (discussing relevance of the timing of two transactions to the step transaction doctrine).

In sum, we suspect that the timing requirements discussed above are, in essence, a working out of the step transaction doctrine in a particular set of circumstances, and, therefore, that, if the Lintons or the government prevails as to the issue of timing, there would be no need to apply the three traditional step transaction doctrine tests. But because neither party contests that the three step transaction doctrine tests apply, and because our application of them does not change the result we reach, we apply them.

**[15]** The step transaction doctrine has been described as "combin[ing] a series of individually meaningless steps into a single transaction." *Esmark, Inc. & Affiliated Cos. v. Comm'r*, 90 T.C. 171, 195 (1988). We note as a threshold matter that the government has pointed to no meaningless or unnecessary step that should be ignored. Nonetheless, examining the step transaction doctrine in light of the three applicable tests, we conclude that its application does not entitle the government to summary judgment.

**[16]** The end result test asks whether a series of steps was undertaken to reach a particular result, and, if so, treats the steps as one. *True*, 190 F.3d at 1175. Under this test, a taxpayer's subjective intent is "especially relevant," and we ask "whether the taxpayer intended to reach a particular result by structuring a series of transactions in a certain way." *Id.* The result sought by the Lintons is consistent with the tax treatment that they seek: The Lintons wanted to convey to their children LLC interests, without giving them management control over the LLC or ownership of the underlying assets. Ample evidence supports this intention. The end result sought and achieved was the gifting of LLC interests. If the transactions could somehow be merged, the Lintons would still prevail, because the end result would be that their gifts of LLC interests would be taxed as they contend.

**[17]** The interdependence test asks "whether on a reasonable interpretation of objective facts the steps were so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series." *Associated Wholesale Grocers, Inc. v. United States*, 927 F.2d 1517, 1523 (10th Cir. 1991) (quotation marks omitted). Under this test, it may be "useful to compare the transactions in question with those we might usually expect to occur in otherwise bona fide business settings." *True*, 190 F.3d at 1176.

**[18]** The placing of assets into a limited liability entity such as the LLC is an ordinary and objectively reasonable

business activity that makes sense with or without any subsequent gift. In *Holman v. Commissioner*, the Tax Court stated that the creation of a limited partnership was not necessarily "fruitless" even if done in anticipation of gifting partnership interests to the taxpayers' children. 130 T.C. 170, 188, 191 (2008) (holding the creation of the limited partnership and the subsequent transfer of partnership interests should not be treated as a single transaction). The Lintons' creation and funding of the LLC enabled them to specify the terms of the LLC and contribute the desired amount and type of capital to it—reasonable and ordinary business activities. These facts do not meet the requirements of the interdependence test.

**[19]** The binding commitment test asks whether, at the time the first step of a transaction was entered, there was a binding commitment to take the later steps. *Comm'r v. Gordon*, 391 U.S. 83, 96 (1968). The test only applies to transactions spanning several years. *True*, 190 F.3d at 1175 n.8; *Associated Wholesale Grocers*, 927 F.2d at 1522 n.6; *McDonald's Rests. of Illinois, Inc. v. Comm'r*, 688 F.2d 520, 525 (7th Cir. 1982) (rejecting application of the test for transactions spanning six months). Here, the Lintons' transactions took place over the course of no more than a few months, and arguably a few weeks. The binding commitment test is inapplicable.

**[20]** The government is therefore not entitled to summary judgment based on an application of the step transaction doctrine.

## CONCLUSION

We reverse the district court's grant of summary judgment in favor of the government, determining that the Lintons' gifts to the children's trusts would be valued as though the gifts were indirect gifts of particular assets and not gifts of the LLC interests. Genuine issues of material fact exist as to the sequence of transactions by which the gifts were made. We

remand this question for the district court to determine, following further proceedings, when the four elements of a gift under Washington state law were simultaneously present, and, in particular, to determine when the Lintons first objectively manifested their intent to make the gifts effective. We also reverse the district court's grant of summary judgment in favor of the government as to the application of the step transaction doctrine. Finally, we affirm the district court's order denying summary judgment to the Lintons, holding that they are not entitled to summary judgment on their failed-gift theory.

The government shall bear the costs of this appeal.

**AFFIRMED IN PART; REVERSED in PART and REMANDED**.